UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DYNAMITE MARKETING, INC.,

                      Plaintiff,

      -against-

THE WOWLINE INC., SHERMAN SPECIALTY, INC., SHERMAN SPECIALTY LLC, WWW.SUPERIORPROMOS.COM, WWW.4ALLPROMOS.CO, UNKNOWN WEBSITES 1-10, VARIOUS JOHN DOES 1-10, and UNKNOWN ENTITIES 1-10,

                      Defendants.
-----------------------------------------------------------------X

DYNAMITE MARKETING, INC.,

                      Plaintiff,

      -against-

4TH DIMENSION INNOVATIONS, INC., by and through its former officer, LAERIK COOPER, and LAERIK COOPER, individually,

                      Defendants.

-----------------------------------------------------------------X

**FILED**
**CLERK**

3:55 pm, Dec 01, 2023

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
CV 19-3067 (GRB)(AYS)

**GARY R. BROWN, United States District Judge:**

In *The Honeymooners*, a 1950s television sitcom, lead characters Ralph Kramden (Jackie Gleason) and Ed Norton (Art Carney) endeavored to film an infomercial for an all-purpose contraption called the "Handy Housewife Helper" that purportedly could open bottles and cans, tighten screws, scale fish, cut glass, sharpen scissors and knives, grate cheese, remove corns and famously "core a apple." The duo endeavored to market this item with the goal of generating $2,000 in revenue. Predictably (and amusingly), the plan met with disastrous failure.



This case involves a design patent dispute over another multi-purpose tool, known as the "Wallet Ninja." Like its sitcom predecessor, the credit card-sized Wallet Ninja claims to embody a broad panoply of functions, including opening cans and bottles and tightening screws. Unlike the "Handy Housewife Helper," the Wallet Ninja proved wildly successful, generating millions in revenue. And with this success came an unwanted side effect: the defendants knocked off the device, leading a jury, following careful consideration of the evidence presented at trial, to uphold the validity of plaintiff's design patent (USD751,877 ("'877")), find that defendants willfully infringed that patent and award plaintiff $1.85 million in compensatory damages. DE 127. That verdict followed on the heels of the jury's initial determination that the claims to inventorship by defendant LaErik Cooper—a putative coinventor whose claims were subsidized and championed by Sherman to torpedo Dynamite's patent claims—lacked substance, as Cooper failed to prove that he had made substantial contribution to the '877 patent. DE 124.

Presently at issue are a phalanx of post-trial motions by the parties.  Defendants attack the verdict on several fronts, seeking judgment as a matter of law, a new trial and/or remittitur on the issues of inventorship, damages, standing, validity, infringement and willfulness.  Plaintiff seeks enhanced damages and attorney's fees.  For the reasons that follow, defendants' motions are DENIED in their entirety, and plaintiff's motion is GRANTED IN PART.

**Background**

During the trial, the parties developed an extensive factual record, which is only summarized here as background for the pending motions.

Around 2003, Alex Shlaferman, Dynamite's principal, devised the concept of the Wallet Ninja, setting out to design a multitool that he could market.  He drew a rough outline on a whiteboard, sending that drawing and other information to defendant Cooper.  Tr. 67-69.  Cooper, a mechanical engineer, operated a business that offered to create mechanical drawings for inventors.  His website boasted a commitment to protecting the rights of inventors, including the phrase "Helping to Engineer Your Ideas" in its logo, and representing that "Your ideas remain just that, your ideas."  Tr. 295; DE 139 at 6; Pl. Ex. 6.  Shlaferman paid him hourly to produce various drawings for the Wallet Ninja and several other projects.  Tr. 280.  Cooper provided drawings that he helped create under this arrangement to Shlaferman's patent lawyer.  Tr. 290.  In 2014, Shlaferman filed for a design patent protecting certain features of the device, which was granted in 2016.  Tr. 99, 293.

The Wallet Ninja enjoyed remarkable market success, being distributed through major retailers and obtaining significant rankings on Amazon.com.  Tr. 563, 566, 644.  In 2017, defendant Davila, on behalf of the Sherman defendants, sent a catalog photo of the device to

three producers in China seeking bids for supply.[1]  Tr. 541, 735–37; Def. Ex. 150–52.  The Sherman defendants began selling a knockoff that they acknowledge infringes plaintiff's patent; even after learning of the infringement, the group continued to sell through the inventory of the items they commissioned.  Tr. 736–78.  After receiving a 2018 cease and desist letter from plaintiff, Pl. Ex. 119, defendants "redesigned" the product—without making any meaningful changes[2]—and continued to sell the product unabated.  Tr. 739.  In fact, defendants' design expert deemed the replacement product "pretty identical" to its first version, also characterizing the new design as "a direct knockoff [or] a direct cloning" of the original design, leading to testimonial confusion between the two items.  Tr. 821–23.  Defendants created a blatantly false letter designed to reassure customers that their new design did not infringe plaintiff's patent.  Def. Ex. 183.  Overall, the various iterations of the knockoff proved the bestselling tool marketed by the Sherman defendants, and the group distributed approximately 800,000 units.  Tr. 740, 759.

After the filing of this litigation, the Sherman defendants obtained an assignment of Cooper's rights as a putative inventor,[3] trying to invoke a standing doctrine that requires the consent of all inventors to proceed with patent litigation.  *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998); *Advanced Video Technologies LLC v. HTC Corporation*, 879 F.3d 1314 (Fed. Cir. 2018).  The Sherman defendants paid Cooper's legal fees and all related expenses.  Tr. 302–03, 757.  Such payment represented a *quid pro quo* for assignment of

---

[1] It's not clear whether defendants were aware at that time that the device was patented.  Though admittedly familiar with intellectual property issues, they did no due diligence.  In time, the testimony revealed, they would unquestionably learn of the patent through the receipt of a cease and desist letter from plaintiff.  Their behavior became, if anything, demonstrably worse.
[2] *Compare, e.g.*, Def. Ex. 173 at 62, *with* Def. Ex. 174 at 86.
[3] Prior to the commencement of trial, the Court raised the validity of Cooper's *nunc pro tunc* assignment of his rights, if any, to the invention to Sherman.  DE 114-1.  The jury's determination concerning Cooper's claims mooted these concerns.

4

the rights he might have held in the patent. Tr. 277. In a bifurcated trial, the jury first determined that Cooper was not an inventor, and then proceeded to determine infringement, invalidity and damages. The jury's findings, contained in two verdict forms, establish that Cooper failed to prove that he had made significant contributions to the claimed design of the '877 patent; that the '877 patent was not invalid either on the basis of obviousness or lack of ornamentality; the defendants infringed the '877 patent; that the infringement was willful; and that plaintiff proved damages in the amount of $1.85 million. DE 124; DE 127. These motions follow.

**Discussion**

*Applicable Standard for Post-Verdict Motions*

A post-verdict motion under Fed. R. Civ. P. 50(b) for judgment as a matter of law in this Court is decided under the decisional authority of the Court of Appeals for the Second Circuit. DE 135 at 3; DE 140 at 4. Thus, defendants' motions seeking judgment as a matter of law, a new trial and remittitur are decided based upon the well-established standard for the consideration of such motions in this Circuit as discussed in detail in *Anderson v. Aparicio*, 25 F. Supp. 3d 303 (E.D.N.Y. 2014), *aff'd and remanded sub nom. Anderson v. Cty. of Suffolk,* 621 F. App'x 54 (2d Cir. 2015), which discussion is hereby incorporated by reference.

Against this backdrop, defendants' motions are easily dispatched.

1. *Cooper's Inventorship Claims and the Issue of Standing*

Defendant Cooper contends that, based on the strength of his purported showing, that no reasonable jury could determine that he did not make substantial contributions to the claimed invention, rendering him a joint inventor of the design contained in the '877 patent. There are many problems with counsel's argument; perhaps the most fundamental is the graphic strawman

5

presented in its brief.  In its effort to contrast what it characterizes as "Shlaferman's minimal input" in the creation of the Wallet Ninja to Cooper's so-called contributions, counsel presents the Court with the following illustration:



DE 128 at 7.  While such sophistry—masked as artistic license—might prove persuasive to someone who did not attend the trial, anyone who paid the slightest attention would quickly recognize this as misdirection.  As the record makes abundantly clear, the '877 patent, which contains illustrations (like '877's Fig. 2 below) that resemble the finished product, only makes claims to limited portions of the outline of the device, as depicted:



FIG. 2



*The Claimed "Solid Line" Areas*

6

Thus, the correct comparison for these purposes is not between Shlaferman's whiteboard design and the manufactured product; a fairer comparison lies between the whiteboard and the design protected by the patent:

 

*Claimed "Solid Line" Areas*

Viewed this way, the differences between Shlaferman's initial concept and the final patented design do not seem quite so significant, and counsel's presentation treads perilously close to an attempt to mislead the Court.

And the analysis does not end there. In itemizing Cooper's comparative contributions to the Wallet Ninja, counsel notes that "[a]s just one example, Shlaferman's design above did not include the hex-shaped cutouts at the bottom of the Wallet Ninja." DE 128 at 7. First, the hex cutouts encompass the *only* example of an element contributed by Cooper. More importantly, however, as the evidence makes clear, the inclusion of hex wrenches was Shlaferman's idea during their iterative exchanges. Tr. 134–35, 164. Cooper can only be credited, as counsel later clarifies, with "the placement and size of the hex-shaped design elements." DE 128 at 9. Thus, far from making a clear and convincing showing of inventorship, Cooper's contributions to the

7

patented design could best be described as incidental.

In fact, Cooper's claim that the positioning of the hex nut cutouts constituted a "significant contribution" finds little support in the record, and is subject to conflicting testimony. According to Cooper, he reordered the hex cutouts such that he "made it look like a mound," with the largest one in the center and the others in bilaterally descending size order. Tr. 175. Cooper claimed that this arrangement not only offered improved functionality by increasing the torque for the larger nuts,[4] but offered his view that such an arrangement made the tool more aesthetically pleasing. Tr. 174–75. The aesthetic assertion is contradicted by testimony from the Sherman defendants that, in creating one iteration of their knockoff, the cutouts were "reorientat[ed] to go from smallest to largest," which they deemed the "proper order," causing the tool to appear "like, a ratchet set [in which] you have a small bit going up to the largest bit." Tr. 698. Cooper's insistence that his largely ornamental change to a single aspect of this device can constitute a substantial contribution fundamentally misapprehends the nature of the item at issue in this case. The Wallet Ninja's packaging wraps the device in breathless superlatives hawking the fact that it encompasses "18 Tools in 1" and "fits in your wallet." Pl. Ex. 202. Thus, the invention's myriad functions drive its value, not the niceties of the appearance—or arguably even the utility—of a particular feature.[5]

On this motion, plaintiff urges the Court to apply the doctrine of equitable estoppel as to Cooper's inventorship claims under *MCV Inc. v. King Seeley Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989), citing an array of facts in support of such application. These facts include Cooper's

---

[4] Notably, "a design may contain both functional and ornamental elements, even though the scope of a design patent claim must be limited to the ornamental aspects of the design." *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016).

[5] This aspect of the case is again reminiscent of the attempt to market the Handy Housewife Helper on *The Honeymooners*. During the filming of the show (which was broadcast live), the prop malfunctioned, unexpectedly springing a fragment of metal through the air. Covering the gaffe, Gleason improvised. "Maybe we ought to say something about spear fishing," he quipped.

general knowledge of the patent process, his specific knowledge of Shlaferman's efforts to patent the Wallet Ninja design, his promises to respect Shlaferman's inventive ideas, his request to Shlaferman to use pictures of the Wallet Ninja on his company's website and his inexplicable silence about inventorship for years after the application for and issuance of the patent. DE 139 at 12. Considering the jury's verdict, the Court need not reach the issue of estoppel. However, these facts equally support the jury's finding that Cooper was not a co-inventor and further doom defendants' motion.

Finally, the Court agrees with plaintiff counsel's characterization that Cooper dissembled on cross-examination. For example, he resisted admitting that he had never made a claim of inventorship or assigned rights as to any projects that he had helped design for customers other than Shlaferman. Tr. 288–89. At one point, he made a hollow, unsustainable claim that, in terms of being named as an inventor on the '877 patent, "I thought I was on it." Tr. 291. His testimony, combined with elements of demeanor that do not appear on the cold record, further support the jury's findings on this issue.

Thus, the jury's determination cannot, under any circumstances, be described as irrational or unlawful, and the Court will not disturb the jury's considered finding on inventorship. Thus, defendants' motion for judgment as a matter of law is denied. This determination also resolves defendants' motion on the issue of standing, which was expressly conditioned upon a finding of co-inventorship. *See generally* DE 134.

2.  *Sherman Defendants' Motions regarding Damages*

Moving under Fed. R. Civ. P. 50(b), defendants seek reduction of damages via a new trial and/or remittitur, claiming that the jury's award was irrational and excessive. Plaintiff sought damages on a lost profit theory under 35 U.S.C. § 284, while defendants argued that their profits

9

from the infringement represented a more reliable measure of damages.  At the outset, in their papers, defendants attempt to mischaracterize the jury's determination.  Counsel asserts that "[p]laintiff argued that it was entitled to lost profits of approximately $1.9 million based on lost sales of approximately $2.8 million," which somehow morphs into "speculation that resulted in lost profits of over $1.8 million, which the jury apparently accepted."  DE 133 at 9, 11.  These assertions greatly oversimplify and mischaracterize the evidence before the jury.  At trial, plaintiff introduced testimony through its expert, Schenk, that plaintiff sustained lost profits in the amount of approximately $1.9 million from lost sales plus another $200,000 in price erosion, totaling approximately $2.1 million.  Tr. 611–12.  In addition, Ms. Schenk's report was admitted into evidence without objection by defendants.  Tr. 624.  In that report, she presents three different estimates of plaintiff's lost profits depending on the selling price employed for the calculation, which estimates totaled approximately $1 million, $1.4 million and $2.5 million.  Pl. Ex. 110 at Tabs 5-7.  At no point, then, did the jury simply accept figures from plaintiff's expert; rather, the determination by the jury represents a reasoned, independent determination of the lost profits sustained by plaintiff, for which there was ample support in the record.

      Perhaps more troubling is defense counsel's misconstruction of its own evidence.  In the brief, counsel repeatedly and vehemently argues that it introduced evidence that defendants' profits from the infringing activity totaled $150,000, and that the Court should use this figure in evaluating the true scope of the loss. DE 133 at 3 (request to "reduce the amount of damages to $150,000"); *id.* at 11 (verdict "fails in the face of competent evidence that the *actual* profits Defendants realized from sales of the accused product were approximately $150,000" and "Defendants only had a profit of $150,000"); *id.* at 12 ("$150,000 [constitutes] the profits that Defendants *actually* realized from sales of the accused product, because that is the only

10

competent evidence of damages that was presented to the jury").

The problem with this assertion is that it is simply untrue. Despite these repeated invocations of $150,000 as the profits obtained from the infringement, the only reference offered by defendants are two pages of the transcript—635 and 636—that contain testimony by plaintiff's expert about her best recollection of information provided by defendants' expert about defendants' illicit profits. In truth, defense counsel elicited testimony from their expert that the profits earned by defendants through their unlawful infringing activities amounted to $390,000, a figure more than two and a half times that fervently cited by defendants' counsel. Tr. 849–50. In response, plaintiff's counsel properly explained the shortcoming of this argument. DE 141 at 14-15; *cf.* Tr. 857–58 (plaintiff's counsel arguing to jury that there was no evidence to support $150,000 in ill-gotten gains). In its reply brief, defense counsel has the unmitigated *chutzpah* to maintain its position and make the following argument:

> Dynamite argues that Sherman's actual profit figure of approximately $150,000 was inadequately supported by the evidence. *See id.* That figure is supported by admissions from Dynamite's expert Ms. Schenk (T635:21-636:3), and Dynamite does not argue that Sherman's profit figure is incorrect.

DE 146 at 8. Counsel's argument appears to be yet another attempt to distort the record and mislead the Court.

Defendants' substantive attack chiefly focuses on whether plaintiff's expert properly applied the first two of the four *Panduit* factors for establishing lost profits, to wit: (1) the existence of acceptable non-infringing alternatives and (2) the demand for the patented product in the marketplace. DE 133 at 4-8. Of course, these questions were presented to the jury, so the issue of whether plaintiff's expert properly analyzed these questions is of limited significance. There was substantial evidence of record of both marketplace demands and the absence of non-infringing alternatives.

"Mere existence of a competing device does not make that device an acceptable substitute." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). This maxim applies with particular force in the context of design patent cases, which must focus on ornamental features, rather than utilitarian considerations. "To be deemed acceptable, the alleged acceptable noninfringing substitute must not [ ] possess characteristics significantly different from the patented product." *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991).

Perhaps the most powerful evidence of these matters—expressly relied upon by plaintiff's expert—emanates from defendants' conduct. From the outset, defendants sought to offer a product that precisely mimicked the patented features of the Wallet Ninja. More telling, however, are defendants' actions after being confronted with irrefutable information that they were infringing the '877 patent. Not only did defendants continue to sell through their inventory of infringing goods, but they engaged in a *faux* redesign process that yielded a product described by their own expert as a "direct knockoff" and a "direct cloning." Tr. 822. Plaintiff's expert proffered these actions as evidence of the absence of non-infringing alternatives in the marketplace, noting that had such a product been available, defendants would not have engaged in a sham redesign process. Tr. 597, 637–38. Thus, defendants' behavior demonstrates that the vein of consumer demand into which they tapped—ultimately selling approximately 800,000 infringing units—required a product with the patented features, and therefore, would not be satisfied with a non-infringing alternative.

Notably, defendants do not offer non-infringing alternatives on this motion, but merely argue that plaintiff's expert failed to properly consider such items and made the same argument to the jury. Tr. 866–67. The jury was then instructed—consistent with the parties' requests—

12

that to recover lost profits, plaintiff was required to establish "that there were no acceptable non-infringing alternatives or if there were, that the plaintiff lost some sales as a result of the infringing activity." Tr. 921. Thus, the evidence supports a determination by the jury that there were no non-infringing alternatives or that plaintiff otherwise established lost sales. In a case such as this one, involving a low-cost, impulse-buy consumer item, the jury's determination in this regard should be afforded particular weight.

On this motion, defendants also attempt to resuscitate their failed *Daubert* motion generally challenging plaintiff's damages expert. DE 133 at 9. However, as this Court previously ruled, both Ms. Schenk's credentials and methodology were more than sufficient to meet the requisite standards for admissibility. Tr. 471–73. The Court afforded counsel ample opportunity to attack the weight that the jury should accord that testimony. Tr. 472. That their efforts failed does not provide a basis for post-judgment relief.

In short, the evidence amply supports the jury's considered determination of damages, and defendants have failed to satisfy the demanding standard for post-trial relief.

### 3. *Defendants' Motion Regarding Validity, Infringement and Willfulness*

Defendants' Post-Verdict Motion purportedly seeks a new trial or relief from the verdict on the grounds of validity, infringement[6] and willfulness under Rule 50(b). Actually, the motion embodies a sweeping attack on the verdict unconstrained by the law, evidence, common sense or the truth. This may be best exemplified by yet another graphic contained in counsel's brief, this

---

[6] Presumably in an effort to avoid the Court's page limits, defendants filed several separate motions seeking essentially the same relief. The height of this practice is embodied in a yet another motion for a new trial on infringement, this time based upon the Court's refusal to allow one of its principals, Robert Davila, a defendant chiefly responsible for the infringement established at trial, to testify as "an expert in the promotional products market" and "the ordinary observer." Tr. 718–22; DE 138. While on this motion defendants present some non-binding caselaw suggesting the Court has the discretion, with a great deal of care, to have permitted this testimony, counsel fails to note that at the time this application was presented, no such authority was offered. *See* Tr. 720–22. Furthermore, defendants have presented nothing to suggest that they were, in any manner, prejudiced by the determination. As such, the Court stands by its decision and the motion is denied.

one submitted in support of counsel's argument that no rational jury could have found infringement:



DE 135 at 11. In conjunction with this graphic (which materially distorts the patent diagram), counsel reiterates its expert's unsupportable opinion that "there's quite a bit of difference between these two so that the object on the right is not confused with the object on the left." *Id.* at 12. Even if one were to observe that, consistent with the maxim of *res ipsa loquitor*, the objects depicted above are exceedingly (and confusingly) similar, that is not the question. Nor is the fact that one of defendants' principals admitted that the accused device infringed plaintiff's patent. Tr. 736–38. The fact remains that this graphic, the referenced testimony and a sheaf of other evidence and arguments by counsel were presented to the jury, which quite reasonably found that the product infringed. And that determination was supported by substantial evidence, including testimony by plaintiff's expert that the products were sufficiently similar so as to cause confusion. Tr. 506–11. Evidence similarly supported the conclusion that the design was not solely functional.

      The same holds true for defendants' attack upon the jury's validity determination. While defense counsel relies exclusively upon its expert's opinion to suggest that the patent design was obvious when compared to the prior art, and therefore invalid, there was sufficient reason to

14

question these opinions, as well as other evidence of record, that amply supports the jury's determination. Moreover, to the extent the expert's obviousness analysis centered on using the patented device as a patchwork exemplar to stitch together pieces of prior art, such analyses are disfavored by the law. *See Grain Processing Corp. v. Am. Maize-Prod. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.").

The balance of defendants' "kitchen sink" motion requires little analysis. For example, counsel attempts to attack the jury's finding of willful infringement based, in part, on a purported good faith belief by the Sherman defendants that Cooper was a coinventor, but since Cooper's role was unknown to defendants until long after the infringing acts, even if true, the defense fails. Likewise, defendants' reliance on the ersatz redesign of its infringing product borders on frivolous. *See* DE 135 at 13. Finally, defendants' argument that the jury verdict form should have required the jury to find the dates of infringement is not only an exercise in irrelevance on this record, but ignores the fact that defendants never requested such an inquiry be made and failed to object to the jury form despite repeated opportunities to do so. Tr. 893–99.

For these reasons, defendants fail to satisfy the exacting standards to warrant judgment as a matter of law and/or a new trial, and the motions are denied.

*4. Plaintiff's Motion Regarding Enhanced Damages and Attorneys' Fees*

Given the determination that defendants willfully infringed, the Court retains the discretion to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Generally, the Supreme Court has held that such enhancement is appropriate where defendants engage in conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously

...

wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016). The Federal Circuit has promulgated a non-exclusive list of factors to help district courts analyze this question:

> (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the infringer's behavior as a party to the litigation, (4) the defendant's size and financial condition, (5) the closeness of the case, (6) the duration of defendant's misconduct, (7) remedial action by the defendant, (8) the defendant's motivation for harm, and (9) whether the defendant attempted to conceal its misconduct.

*Sunoco Partners Mktg. & Terminals v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir. 2022). The Court is not required to discuss these factors but should rather focus on "the particular circumstances of the case." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382–83 (Fed. Cir. 2017). Nevertheless, most, if not all of these factors could well support enhanced damages in this case. The jury's finding of willful infringement was based on substantial evidence of a pattern of bad conduct on the part of defendants, including its initial theft of plaintiff's patented design (which was, at a minimum, reckless), its failure to stop selling its inventory of pirated goods after receipt of a cease and desist letter and its utterly indefensible mock redesign process.

In addition, pursuant to 35 U.S.C. § 285, should the Court determine that the action represents an "exceptional case," it retains the discretion to award attorneys' fees. Perhaps unsurprisingly, after years of heated (and costly) litigation in a manner that defendants' counsel concedes was "hard-fought," DE 137 at 5, plaintiff seeks an award of enhanced damages and attorneys' fees and costs. Plaintiff's counsel devotes considerable energy to recounting defendants' conduct during the litigation—which was, at times, unacceptable. *See generally* DE 136. In considering an application for attorneys' fees, the Court may consider "the unreasonable

16

manner in which the case was litigated." *Spineology, Inc. v. Wright Med. Tech., Inc.*, 910 F.3d 1227, 1229 (Fed. Cir. 2018). And defendants' approach to this case, which was (and remains) highly unreasonable, certainly justifies an award of attorneys' fees. For example, defendants unnecessarily multiplied the proceedings by bankrolling Cooper's inventorship claims, which bordered on frivolity. Moreover, defendants continued adoption of unreasonable positions, several of which are cataloged herein, plainly, and unfairly, added unjustified layers of complexity and expense to the resolution of the case.

On this motion, plaintiff seeks attorneys' fees of $1,134,157.50; expert fees of $250,168.86; and costs of $152,317.91, which total $1,536,644.27. *See generally* DE 136. Importantly, in reviewing such requests, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So, trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *LCS Grp. LLC v. Shire LLC*, 383 F. Supp. 3d 274, 279 (S.D.N.Y. 2019) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). In addition, plaintiff seeks the discretionary imposition of prejudgment interest.[7] While opposing, in general, the imposition of such fees and costs, defendants quarrel with a few items, but mostly rely on a general assertion that the figures are unreasonable and insufficiently documented.[8] *See generally* DE 137. Few specifics are provided, other than an argument that expert fees are not generally recoverable under § 285,

---

[7] Relying upon *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001), defendants argue than an inordinate delay in commencing the action militates against the discretionary imposition of pre-judgment interest. *But see General Motors Corporation v. Devex Corporation*, 461 U.S. 648, 656–57 (1983) ("Prejudgment interest should ordinarily be awarded."). To avoid any question concerning the prejudice from delay, and difficulties that might arise from fixing a precise date of loss, the Court will impose pre-judgment interest at the U.S. Treasury rate from the date of the filing of this action.

[8] Based on the Court's familiarity with this matter, at a macro level, the amounts sought do not seem unreasonable given the length and complexity of these proceedings.

17

though it remains within the Court's inherent powers to make such an award. For the reasons that follow, the Court hereby awards the amounts sought as requested, which will compensate plaintiff for the costs of this protracted litigation while simultaneously serving the ameliorative purposes of an award of enhanced damages under § 284.

Plainly, defendants' conduct, both during the underlying infringement as well as the course of the litigation, satisfies the requisite for the shifting of attorneys' fees and other costs and justify the imposition of an award of enhanced damages. The Supreme Court has characterized the imposition of enhanced damages as a "discretionary punishment" for "willful infringement." *Halo Elecs., Inc.*, 579 U.S. at 104–05. Traditionally, in other contexts, such punitive damages are frequently awarded in small multiples of the amount of compensatory damages, a factor that becomes important here. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 581 (1996) (cataloging legislative provisions for double, triple or quadruple punitive damages). Here, the amounts sought for attorneys' fees, expert fees and costs—totaling over $1.5 million plus interest—is roughly equivalent to an award of double damages, which here would amount to an additional $1.85 million. Thus, the Court hereby exercises its discretion to impose attorneys' fees, expert fees and costs in the amount of $1,536,644.27 plus pre-judgment interest from the date of the filing of the complaint in this action and declines to award enhanced damages.

*Permanent Injunction*

Plaintiff seeks a permanent injunction against the Sherman defendants, who endeavor to assure the Court that such an injunction is moot as they claim to have discontinued their infringing activities. The Court is unpersuaded that there is no ongoing risk, and therefore the motion for a permanent injunction against further infringement is GRANTED as to the Sherman defendants. As to Cooper and other non-parties against whom plaintiff seeks a permanent

injunction, such motion is denied.

**Conclusion**

Based on the foregoing, defendants' motions for post-trial relief are DENIED in their entirety.  Plaintiff's motion for the award of fees, costs and enhanced damages is GRANTED to the extent described herein.  Plaintiff's motion for a permanent injunction against the Sherman defendants is GRANTED, but is DENIED as to all other parties.  Plaintiff shall submit an order, preferably upon consent, containing the terms of a proposed injunction forthwith.

The Clerk is directed to enter judgment consistent with this opinion and close the case.

Dated: Central Islip, New York
      December 1, 2023

                    /s/ Gary R. Brown
                    HONORABLE GARY R. BROWN
                    UNITED STATES DISTRICT JUDGE